```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       HOUSTON DIVISION
```

UNITED STATES OF AMERICA          §
                                  §
                                  §
v.                                §          C.R. NO. H-03-363
                                  §
                                  §
JAMES A. BROWN                    §


<u>MEMORANDUM & ORDER</u>


Pending are Defendant James A. Brown's Motion for New Trial (Document No. 1004); Defendant James A. Brown's Supplemental Memorandum in Support of Motion for New Trial (Document No. 1020); Defendant James A. Brown's Supplemental Brief in Support of Motion for New Trial on Counts IV and V (Document No. 1160); Defendant James A. Brown's Supplemental Memorandum in Support of His Motion for New Trial (Document No. 1217); Defendant James A. Brown's Motion to Dismiss Indictment for Egregious Prosecutorial Misconduct, <u>Brady</u> Violations, and Double Jeopardy (Document No. 1168); and Defendant James A. Brown's List of Authorities Ordering Dismissal of Indictment for Prosecutorial Misconduct (Document No. 1231).  After having made an exhaustive study of the motions, responses, and replies, together with the exhibits, and having carefully considered the oral arguments and the applicable law, the Court finds for the reasons that follow that no evidentiary hearing is necessary and that the motions should be DENIED.

I.  Underline: Background

In November 2004, Defendant Brown was convicted by a jury of charges of conspiracy, wire fraud, perjury, and obstruction of justice.[1]  Although the Fifth Circuit reversed Brown's wire fraud and conspiracy convictions because of the flawed honest services theory, it affirmed his "conviction and sentences . . . on [the] charges of perjury and obstruction of justice."  United States v. Brown ("Brown I"), 459 F.3d 509, 531 (5th Cir. 2006).  Brown now seeks a new trial on these convictions of perjury and obstruction of justice that the Fifth Circuit affirmed in 2006, and dismissal of the conspiracy and wire fraud counts of the Indictment.

The perjury and obstruction charges arose from Brown's 2002 testimony to the grand jury investigating the Enron Nigerian barge transaction, wherein he testified that Enron's belief that it was obligated to get Merrill Lynch out of the barge deal by June 30th was "inconsistent with my understanding of what the transaction was," that he had no information as to the promise that Merrill Lynch would be taken out by sale to another investor by June 2000, and that he had no understanding as to why a Merrill Lynch document would refer to a promise that Merrill Lynch would be taken out by a sale to another investor by June of 2000.  See Brown I, 459 F.3d at 527.

_____

[1] Document No. 628.

2

## II.  <u>Motions for New Trial</u>

Brown asserts that newly discovered evidence, allegedly unknown during the first trial due to government suppression or non-disclosure, proves that Enron did not make such a promise or obligate itself, and therefore Brown's testimony to the grand jury was literally true.[2]  This, of course, was the central issue in Brown's five weeks long trial in which voluminous evidence was received.  The Court of Appeals well summarized the evidence in affirming Brown's convictions on perjury and obstruction.  *See* <u>Brown I</u>, 459 F.3d at 513-516, 525-531.  Brown presents no new evidence that his grand jury testimony truthfully disclosed his actual belief of the nature of the transaction, or of his lack of any understanding as to *why* Enron felt obligated to take Merrill Lynch out of the deal by June 30th and as to *why* Merrill Lynch's document would refer to a promise of such; rather, the asserted "new evidence" supports a hypothesis that the nature of the transaction was such that Brown's characterization of it turns out to be literally true.

Brown's assertions of <u>Brady</u> violations and of newly discovered evidence are all linked to two Enron employees involved in the barge transaction, and five of Brown's co-employees at Merrill Lynch, plus Merrill Lynch's outside counsel who Brown himself

---

[2] *See, e.g.*, Document No. 1004 at 5; Document No. 1020 at 1 & n.1; Document No. 1061 at 2-3, 6.

3

retained to work on the barge transaction.  The Enron employees were (1) its former Treasurer, Andrew Fastow, who in January 2004 (eight months before Brown's trial) pled guilty to two counts charging conspiracy to commit wire fraud and conspiracy to commit wire and securities fraud, and became a cooperating government witness; and (2) its former Treasurer Jeffrey McMahon, who was never indicted in the multiple Enron-related criminal cases.  The Merrill Lynch employees and counsel were (1) Katherine Zrike, Chief Counsel for Merrill Lynch's investment banking division, who testified at Brown's trial during presentation of the defense case; (2) Gary Dolan, another in-house Merrill Lynch attorney whom Brown knew and consulted while working on the barge transaction; (3) Schuyler Tilney, former head of the Merrill Lynch banking office in Houston; (4) Kevin Cox and (5) Paul Wood, two Merrill Lynch employees in the credit department; and (6) Alan Hoffman, an attorney with a New York law firm that was Merrill Lynch's outside retained counsel on aspects of the barge deal.

A.   Legal Standard

Generally, to obtain a new trial based on newly-discovered evidence, a defendant must demonstrate that: (1) the evidence was discovered after trial; (2) the failure to discover the evidence was not due to defendant's lack of effort; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and

4

(5) the new trial would probably produce a new result.  United States v. Runyan, 290 F.3d 223, 246-47 (5th Cir. 2002).  "Motions on grounds of newly discovered evidence 'are not favored by the courts and are viewed with great caution.'"  United States v. Vergara, 714 F.2d 21, 22 (5th Cir. 1983) (quoting 3 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 557, at 315 (1982)).

"[W]hen a motion for new trial based on newly-discovered evidence raises a Brady claim," a court instead applies "the three-prong Brady test to determine whether a new trial is appropriate." United States v. Runyan, 290 F.3d 223, 247 (5th Cir. 2002).  Under Brady v. Maryland, 83 S. Ct. 1194 (1963) and its progeny, the government may not withhold evidence that is favorable to a criminal defendant.[3]  To establish a Brady violation, a defendant must show that (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed

---

[3] Brown has made a multitude of Brady requests over the course of several years, culminating in last month's Emergency Motion to Compel the Production of Brady Material (Document No. 1222), which the government has moved to strike (Document No. 1225).  Brown's most recent requests echo past filings, with sweeping requests such as for "[a]ll raw interview notes of any government agent or attorney, draft 302s, including copies containing any highlighting by the [Enron Task Force], and any other evidence in the government's possession (and not previously disclosed) from Andrew Fastow."  Document No. 1222 at 4.  Brady, however, "does not permit a defense fishing expedition whenever it is conceivable that evidence beneficial to defendants may be discovered."  United States v. Scott, 555 F.2d 522, 528 (5th Cir. 1977).  This having been said, the government still must comply with its actual Brady obligations and this Court requires complete compliance with that duty.

evidence was material to either guilt or punishment.  Runyan, 290 F.3d at 247; *see also* United States v. Skilling, 554 F.3d 529, 574 (5th Cir. 2009), *vacated in part on other grounds*, 130 S. Ct. 2896 (2010).  Evidence is not "suppressed" when a defendant "knows or should know of the essential facts that would enable him to take advantage of it."  Skilling, 554 F.3d at 575 (quoting Runyan, 290 F.3d at 246).  Indeed, a defendant must "establish that his or her failure to discover the evidence was not the result of a lack of due diligence."  Id. at 574; *see also* United States v. Sipe, 388 F.3d 471, 478 (5th Cir. 2004) ("[T]he State bears no responsibility to direct the defense toward potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence.").

Suppressed evidence is material under Brady when there is a "reasonable probability" that the outcome of the trial would have been different had the evidence been disclosed to the defendant; a defendant establishes such a probability upon a showing that the government's suppression of the evidence "undermines confidence in the outcome of the trial."  Runyan, 290 F.3d at 247 (discussing Kyles v. Whitley, 115 S. Ct. 1555, 1566 (1995)).  In assessing materiality, the court weighs the cumulative effect of all suppressed evidence relative to the disclosed evidence.  Skilling, 554 F.3d at 579-80; Sipe, 388 F.3d at 478.  "[W]here suppressed evidence is merely cumulative, no Brady violation occurs."

6

Skilling, 554 F.3d at 580.  Moreover, the materiality of any non-suppressed information is irrelevant to this analysis.  Skilling, 554 F.3d at 591.

B.  Discussion

    1.  Evidentiary Hearing

    Brown requested an evidentiary hearing on his request for new trial, and the Court heard oral arguments on that subject on June 24, 2010.  Although an evidentiary hearing on a motion for new trial may be available, one is not required, and it is within a court's discretion whether to conduct such a hearing.  Runyan, 290 F.3d at 248 (citing United States v. Blackburn, 9 F.3d 353, 358 (5th Cir. 1993)).

    Having now had opportunity carefully to review Brown's multiple, prolix briefing on his motion for new trial, together with the evidentiary support submitted,[4] and having also heard oral arguments on the motion, the Court finds no showing that an evidentiary hearing would add substantively to the record or materially assist the Court in ruling on the motion.  Brown's

---

    [4] Brown has filed more than 150 pages of briefing on this motion alone, plus hundreds of pages of exhibits.  By comparison, the government's 100 pages of briefing, most of which also doubles up to answer Brown's separate Motion to Dismiss for Prosecutorial Misconduct, seems rather laudable.

7

request for an evidentiary hearing on the motion is therefore DENIED.

2. <u>Asserted *Brady* Violations and Newly Discovered Evidence</u>

As noted above, the alleged <u>Brady</u> violations and claimed new evidence relate primarily to eight individuals. Each is discussed in turn, followed by an analysis of the cumulative materiality of any suppressed evidence.

i. <u>Andrew Fastow</u>

The largest portion of Brown's briefing and supporting evidence is focused on the raw notes of investigating agents, and testimony and depositions of former Enron CFO Andrew Fastow. Each is discussed in turn.

a. <u>Fastow Raw Notes</u>

Both before and after Fastow entered his guilty plea in January 2004, the FBI conducted extensive interviews of him regarding numerous Enron-related financial transactions, including the Nigerian barge deal with Merrill Lynch, resulting in almost 420 pages of handwritten notes (the "Fastow Raw Notes"). *See* <u>Skilling</u>, 554 F.3d at 577. Agents prepared two summary FBI Form 302s[5]--one

---

[5] An FD-302 form, commonly called a 302, typically contains memoranda of interviews conducted by FBI agents. *See* <u>United States v. Gaston</u>, 608 F.2d 607, 610 (5th Cir. 1979).

in December 2003 and another in January 2005. Fastow later
testified as a government witness in the 2006 criminal trial of
former Enron president Jeffrey K. Skilling. Then, in late 2006 and
after Fastow had been sentenced, he testified by deposition in the
Newby Enron shareholder litigation.[6]  *See* In re Enron Corp.
Securities, Derivative & ERISA Lit., No. MDL-1446, Civil Action No.
H-01-3624 (S.D. Tex. filed Oct. 22, 2001).  Brown asserts that
Fastow's testimony and the F.B.I.'s raw notes of Fastow interviews
demonstrate that the barge transaction involved no promise or
guarantee by Enron that the barges would be taken off of Merrill
Lynch's hands.

During the pendency of Jeffrey Skilling's appeal, the Fifth
Circuit ordered the government to produce the raw notes taken by
federal agents in their interviews of Andrew Fastow. *See* Document
No. 0051235478, United States v. Skilling, No. 06-20885 (5th Cir.),
filed November 1, 2007.  The Court of Appeals ordered this
production to enable Skilling, if he could do so, to support his
argument on appeal that the raw notes of Fastow's interviews
constituted Brady material.  The Fifth Circuit ultimately deter-
mined, on plain error review, that the government's non-production
of the raw notes to Skilling before his trial was *not* a Brady
violation.  Skilling, 554 F.3d at 591.  Brown, in the present

---

[6] *See* Skilling, 554 F.3d at 578-79 (testimony); *see also*
Document No. 1160, ex. C (Newby deposition).

9

motion, extracts 18 pages from these voluminous raw notes in which references are attributed to Fastow about the barge transaction and, like Skilling, he also contends that they constitute Brady material.   The Court has carefully examined all of these raw notes--including the excerpted pieces, phrases, and out-of-context passages relied upon by Brown--and finds that they are substantially consistent with the disclosure letter summarizing Fastow's recollections that the government provided to Brown and his co-defendants in advance of Brown's trial.

First, Brown quotes an excerpt from the raw notes in which Fastow, in the context of being asked about the 6/29/00 Benefits to Enron Summary, says "it was [Enron's] obligation to [use its] 'best efforts' to find 3rd party takeout," but Brown omits the rest of the sentence which reads, "& went on to say there would be 3rd party [because] [Fastow] is manager of 3rd party."[7]   Fastow added, "LJM was 3rd party and [it] was already found."[8]   Brown also quotes a raw note that reads, Enron "best efforts to get [Merrill Lynch]

_____

[7] Document No. 1160, ex. A at 000263 [hereinafter "Fastow Raw Notes"].

[8] Id.  LJM was a pseudo third-party entity created to help Enron "improperly hedge its investments."  Skilling, 554 F.3d at 538.  Fastow was its general partner.  Id.  Around the time of the Nigerian barge deal, LJM "apparently was running out of capital, so Fastow raised nearly $400 million in capital and formed LJM2, another third party entity that could conduct deals with Enron." Id. at 539 n.6.  This Court, like the Fifth Circuit in Skilling, and as was frequently done throughout the Fastow Raw Notes, will refer to LJM and LJM2 simply as "LJM."  See id.

out,"[9] but *omits* that this excerpt is in the context of notes on
the 12/23/99 telephone conference, the topic of which Fastow said
was "assurance [to Merrill Lynch] they would be out & rate of
return as well," . . . "primary issue was assurance of take out."[10]
Fastow in this same interview adds:

> Intent for anyone on call to come away with understanding
> that [Enron] would take necessary steps to make sure
> [Merrill Lynch] won't own barges on 6/30/00
>
> > (a) and buyer will probably be LJM (Didn't use
> > word LJM)
> >
> > (b) "Necessary steps"--was saying, as CFO
> > Enron, that Enron will have continuing
> > attention to the barges
> >
> > (c) Intent to guarantee they won't hold barges
> > in 6 mos
> >
> > (d) By referencing General Partner was in
> > effect giving the guarantee . . . .[11]

Brown also points to statements that Fastow "never used the word
promise"[12] and could not "give a verbal or written guarantee"[13]
because Enron "could not buy back [the barge equity interest]
[because] it would [have to] reverse the earnings."[14]  However, the

---

[9] Fastow Raw Notes at 000348.

[10] Id. at 000347.

[11] Id. at 000348.

[12] Id. at 00084A.

[13] Id. at 000262.

[14] Id. at 000178.

raw notes also state that he was "being clever by using euphemisms to get them to believe he was using the word promise"[15]--in other words, he did not need to use the *word* promise to *convey* a promise. Furthermore, though Brown points to the raw notes statement that there was "every intention that Enron would find a [third-party] buyer" for Merrill Lynch's equity interest,[16] the notes also state that "[Fastow] didn't see risk [because] either [Enron] found 3rd party or buy-back,"[17] and that Fastow was:

> [H]ighly, highly confident there will be 3rd Party buyer in 6 mos.  I'm confident [because] I am GP of LJM [and] LJM is chiefly interested in the Barges.  Talked about 6 mos. period come June 2000, if [Enron] did not have a buyer then LJM would step in to Buy out.  Nobody [cut off] have any doubt that LJM would buy out.[18]

Further, Brown asserts that the raw notes statement that "Fastow objected to the word 'obligation' in Glisan email" contradicts the disclosure in the government's June 2004 discovery letter that states "Fastow was not bothered by Glisan's use of the word 'obligated' to describe Fastow's representation of Enron's agreement to get Merrill out of the barge deal."[19]  Glisan's 5/11/00

---

[15] Id. at 000084A.

[16] Id. at 000084A.

[17] Id. at 000033.

[18] Id. at 000176.

[19] Document No. 1160, ex. B at 5 [hereinafter "June 2004 Disclosure Letter"].

email read, "To be clear, Enron is obligated to get Merrill out of the deal on or before June 30."[20]  The raw note was made when Fastow examined that email.  The note, which appears internally contra-dictory, reads:

> 1)  Did not see Email [before] today.  Object to word obligated.   not  bothered  that  it  is  [Enron] w/obligation.[21]

The Fifth Circuit considered a similar argument in <u>Skilling</u> regarding the alleged difference between this Fastow raw note and summary 302s provided to Skilling in that trial, where (unlike Brown's trial) Fastow did testify.  The Court wrote:

> The 302s, however, effectively disclosed the information in these statements.  Skilling knew of the content of the interview notes concerning the Glisan email based upon Fastow's repeated statements in the 302s that Enron would not repurchase the barges, because LJM would instead. That is, the 302s did not indicate that Enron was obligated, which is consistent with the information in the interview notes.  Thus, Skilling already had the

---

[20] *See* <u>Skilling</u>, 554 F.3d at 589-90.

[21] Fastow Raw Notes at 000264. This is one of the problems with raw notes: the meaning of what an interrogator jots down can often be understood only by the interrogator.  Here, for example, while Brown advances one interpretation of what should be inferred, other possibilities also exist.  Thus, the first phrase, "Object to word obligated," could have been a question, or a topic of inquiry, or an initial mistaken entry of what Fastow said,--with the second statement, "not bothered that it is [Enron] with obligation," being Fastow's answer or clarification.  Various possibilities exist. For this reason, one ordinarily should not place undue reliance on a fragmentary raw note lifted out of context and at seeming variance with other raw notes on that topic.

> information necessary to challenge Fastow's statement
> that the email "reflected" the guarantee.

Skilling, 554 F.3d at 589-90.  As stated, Fastow did not testify at

Brown's trial, and 302s of Fastow's interviews were not provided to

Brown before his trial.  Instead, the government in advance of

trial delivered to Brown disclosure letters dated June 1, 2004,

and July 30, 2004.   The June 2004 Disclosure Letter contains

substantially the same information as those portions of the 302s

relied upon by the Fifth Circuit in rejecting Skilling's comparable

argument.[22]  The June 2004 Disclosure Letter given to Brown before

trial states:

> In Fastow's discussion with Merrill, Fastow alluded to
> his position as general partner of LJM, and his ability
> to use LJM to take Merrill out of the Barge deal, if
> necessary.  Fastow spoke with Rebecca McDonald, the head
> of APACHI, regarding LJM's buyout of Merrill.  She said
> that APACHI had a buyer lined up to buy the Barges but
> the buyer was not yet ready.  Fastow may have told
> McDonald that Enron had to get Merrill out of the Barge
> deal.

---

[22] The Fifth Circuit also concluded that there was no Brady
violation in Skilling while reviewing for clear error.  554 F.3d
at 591.   Furthermore, the 302s discuss the "Benefits to Enron"
document specifically, whereas the June 2004 Disclosure Letter is
written in more generic terms.   While recognizing that the Fifth
Circuit's analysis is thus not strictly controlling, this Court,
after conducting an independent comparison of the notes and the
June 2004 Disclosure Letter, finds the Fifth Circuit's analysis of
the Fastow Raw Notes regarding the Nigerian barge transaction to be
accurate and instructive in this analysis.   Indeed, as noted, the
summary disclosure provided in this case is substantially similar
to the 302s examined in Skilling.

Merrill believed that Merrill would be taken out of the
Barge deal because Fastow gave Merrill verbal assurances
that Merrill would be taken out in six months.  Fastow
does not recall using the word "promise" in his telephone
call to Merrill, but he cannot say that with certainty.
Fastow thought that he was being clever during the
telephone call with Merrill by using euphemisms in order
to convey to Merrill a promise to take Merrill out of the
barges.  Fastow stated to Merrill that Fastow had an
extremely high level of confidence that Merrill would not
lose money in the Barge deal.  Fastow talked about how he
was the General Partner of LJM, and that LJM was
interested in buying an interest in the Barges, but not
at the end of the last quarter of 1999.

. . .

Fastow did not say Enron would buy back the barges, but
represented instead that a third party would.  Fastow did
say that Enron will take the necessary steps to make sure
Merrill is out of the deal by June 30, 2000.  It was
reasonable for anyone listening to the call to think that
it was Enron that was going to buy them out.

. . .

Enron was the marketing agent, but could not make anyone
buy at a specified time, price or return.[23]

Like the summary 302s in Skilling, the government's June 2004

Disclosure Letter gave Brown "all the information necessary" to

prepare his defense with respect to Fastow's description of what

transpired.[24]  See Skilling, 554 F.3d at 589.  Brown has thus failed

---

[23] June 2004 Disclosure Letter at 3-5.

[24] Brown asserts that the June 2004 Disclosure Letter's
omission of any reference to a "best efforts" agreement renders it
materially different from the 302s because "best efforts" is a term
of art.  Document No. 1201 at 2.  This does not materially differ
from the disclosed information that "Enron was the marketing agent,
but could not make anyone buy at a specified time, price or
return."

to show suppression of any complained-of information in the Fastow Raw Notes regarding the nature of the transaction and Fastow's conduct in his call with Merrill Lynch representatives. That Fastow did not actually testify at Brown's trial offers Brown no recourse because the government expressly offered to require Fastow to testify if Brown or any of his co-defendants desired his testimony.[25]

Brown further asserts that the raw notes show "evidence that was never disclosed"--that Fastow "confirmed" that the draft documents relating to the transaction went through multiple iterations, and likely were reviewed by Arthur Andersen to confirm the transaction's legality.[26]   Brown's suggestion that there was suppression of evidence that the draft documents went through multiple iterations has no merit.   Testimony and evidence admitted at Brown's trial showed that Enron and Merrill Lynch exchanged at least three versions of the engagement letter setting forth the terms of the deal.[27]   Katherine Zrike, Merrill Lynch's most senior in-house counsel on the deal and a defense witness, also testified

_____

[25] Document No. 248 at 3; Trial Tr. at 2653.  Indeed, in view of this fact, it would be difficult for Brown to prove a Brady violation for *any* discrepancy between the raw notes and the government disclosure, as he must establish that his "failure to discover the evidence was not the result of a lack of due diligence." Skilling, 554 F.3d at 574; *see also* United States v. Sipe, 388 F.3d 471, 478 (5th Cir. 2004).

[26] Document No. 1160 at 6-7.

[27] Gov't Exhibits 507, 515, 518.

about the roles of lawyers and accountants in drafting the deal
documents.[28]  Moreover, the Disclosure Letter summarized Fastow's
response to a reference to Arthur Andersen in the Summary of the
Transaction document:

> In Fastow's view, this passage suggests that Enron
> discussed the barge deal with Andersen and Anderson [sic]
> told Enron not to change the transaction because there
> would be a problem.[29]

On the other hand, if Brown relies on these statements to show that
Fastow corroborated the evidence already presented at trial, the
statements are merely cumulative, and therefore lack materiality.
See Skilling, 554 F.3d at 591.

Finally, Brown also asserts that the Fastow Raw Notes disclose
that Fastow misrepresented the nature of the transaction within
Enron, thereby undermining the testimony of any Enron employee--
such as Ben Glisan and Michael Kopper, subordinates to Fastow--as
to the nature of the transaction.[30]  Specifically, Brown argues:

> Fastow had deliberately misled his "'subordinates' by
> 'tell[ing] Enron people' this was a 'guarantee' to
> 'motivate' and 'light a fire' within Enron to remarket
> the barges to a third-party."[31]

---

[28] See, e.g., Trial Tr. at 4110, 4132-34.

[29] June 2004 Disclosure Letter at 5-6.

[30] Document No. 1160 at 8.

[31] Document No. 1160 at 9 (citing Fastow Raw Notes at 000349).

In context, the Fastow Raw Notes state:

> W/Subordinates
> 1) Probably used a shorthand word like promise or guarantee[.]
>
> 2) Internally at Enron.  AF, JM + BG would tell Enron people there was a guarantee so to light a fire under Int'l people - so it should be in paperwork
>
> 3) On phone call, didn't say [Enron] would buy back, Rep of 3rd Party.  Explicit.
> Internally said Enron would buy back.  Unit less motivated if knew of LJM.
> "Enron will take necessary steps to make sure you are out of this by June 00" → Reasonable for person on other end to think Enron.[32]

Brown has failed to show the materiality of this information. Fastow internally referred to a "promise" or "guarantee" as *shorthand* to keep the International Division's focus on the need to get Merrill Lynch off the hook by the end of six months.  Again, this is consistent with the government's June 2004 disclosure of Fastow's representations to Merrill Lynch on the phone call--that Enron would ensure Merrill Lynch would be taken out of the deal because, if all else failed, Fastow could use his position as general partner of LJM to take Merrill Lynch out of the barge deal.

The Fifth Circuit addressed a very similar argument in Skilling, with respect to these same raw notes:

> This statement does not contradict Fastow's assertions that he made an implicit guarantee to Merrill Lynch.

---

[32] Fastow Raw Notes at 000349.

Immediately preceding these notes, Fastow discussed the guarantee with Merrill Lynch extensively, repeatedly noting that he had made a guarantee in everything but name and was avoiding the word to protect the accounting treatment. Thus, he was not necessarily lying when using words like "promise" or "guarantee" with his subordinates.

Further, these notes do not support Skilling's argument that Glisan and Loehr based their testimony only upon Fastow's lies. First, the notes report Fastow as saying that "BG," presumably Ben Glisan, was party to the plan to "tell Enron people that this was a guarantee." As Skilling bases his argument that Fastow "lied" to Glisan upon this statement, it is difficult to understand how it indicates that Fastow lied to Glisan about something which they were then both supposed to lie about to "Enron people." That is, it is unlikely that Glisan was confused about the nature of the deal as a whole if he was also lying to the "Enron people." Second, Loehr worked at both Enron and LJM, and he offered explicit testimony about the intricacies of the Enron/LJM interactions, so it is unreasonable to conclude that he was tricked by Fastow's alleged lie. Therefore, it is unlikely that Skilling could have used this statement to impeach either corroborating witness.

Skilling, 554 F.3d at 590. As the government points out, Kopper, like Loehr, was an employee of both Enron and LJM; in fact, Fastow sold LJM to Kopper in 2001.[33] Thus, it is even less likely than with respect to Loehr that Kopper was unaware of the nature of the transaction.

In sum, the only pieces of information from Fastow that arguably were suppressed are: (1) Fastow's corroboration of evidence that the deal went through multiple drafts and (2) Fastow's assertion that he told "Enron people there was a

_____

[33] Trial Tr. at 1291.

guarantee so to light a fire under" them.  That each fails to meet the materiality test has been discussed above; the Court will nonetheless consider these statements along with any other suppressed information in a combined materiality analysis below. *See* Skilling, 554 F.3d at 579-80; Sipe, 388 F.3d at 478.

### b.  Fastow's Testimony and Deposition

Brown also contends that Fastow's subsequent testimony in Skilling and his deposition in Newby merit a new trial.  This contention must rest solely on an assertion of "newly discovered evidence," as the government could not have suppressed Fastow's Newby and Skilling statements prior to Brown's trial; they were given *after* Brown's trial.  *See* 2 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 256, at 141 (4th ed. 2009) ("[E]xculpatory evidence must exist at the time of the trial to qualify as Brady material.").  The Court will therefore apply the five-part newly discovered evidence test.  *See* United States v. Runyan, 290 F.3d 223, 246-47 (5th Cir. 2002).

Fastow's central involvement in the barge deal was well known to Brown and to his co-defendants.  Presumably desiring to save Fastow's debut as a government witness until the much higher profile Lay/Skilling trial, the government elected not to call him as a witness in Brown's trial.  Significantly, however, the government offered to require Fastow to testify if Brown or any of

his co-defendants desired his testimony.  It informed the Court and Defendants on June 3, 2004:  "While Fastow is entitled to assert the Fifth Amendment if called by any third party, including the defense, the government will, if asked, require Fastow to testify in this trial pursuant to his cooperation agreement [in Fastow's plea agreement] with the government if the defense believes his testimony could assist them in any way."[34]  Neither Brown nor any of his co-defendants took the government up on its offer.  Indeed, the Court even reminded Defendants at trial that "the Government . . . told you that Mr. Fastow would be glad to testify--may not be glad to--but they would certainly see to it that he testifies, if you wish him to testify."[35]

This alone renders Fastow's subsequent testimonial statements an insufficient basis for new trial due to Brown's lack of effort to procure Fastow's available testimony, or perhaps more precisely,

---

[34] Document No. 248 at 3.

[35] Trial Tr. at 2653.  The Court was favorably impressed at the time that Brown and his five co-defendants were represented in trial by some of America's preeminent criminal defense attorneys. Given the government's fair disclosures of the substance of Fastow's statements to the FBI, the separate decisions not to call Fastow made by six separate sets of top defense lawyers were not at all surprising.  Their wisdom was borne out when Fastow later testified at the Lay/Skilling trial and in the Newby deposition. It is inconceivable that even a neophyte defense trial lawyer would call a witness with the harmful testimony Fastow was expected to give simply to "impeach" him with raw notes that the deal documents went through several iterations and Fastow told his subordinates-- in order to "light a fire under them" to get a buyer for Merrill Lynch's barge interest by June 30, 2000--that Enron had made a promise or guarantee to Merrill Lynch to do so.

his considered decision not to call Fastow.  *See* United States v. Lowder, 148 F.3d 548, 551 (5th Cir. 1998) (defendant not entitled to new trial where he had "not met his burden of demonstrating that the failure to procure [a witness's] testimony at trial was not the result of his own lack of diligence").

In addition, Fastow's testimony in Skilling and deposition in Newby are consistent with the raw notes, which, as discussed above, are consistent with the government's June 2004 Disclosure Letter. Thus, Fastow's post-trial testimonial statements in all likelihood would have been even more persuasive in support of the government's case than the testimony of witnesses the government called, and assuredly would probably not have produced a different verdict. Also, due to the substantive similarities between Fastow's subsequent testimony and the disclosure letter given to Brown before trial, Brown's various assertions that he lacked the information necessary to determine whether to call Fastow lack merit.

ii.  Jeffrey McMahon

Jeffrey McMahon was Treasurer of Enron when the 1999 year-end Nigerian barge transaction was consummated with Merrill Lynch.  At the request of Enron Division APACHI personnel, McMahon contacted Merrill Lynch to request that it contact the APACHI Division regarding the Nigerian barges.  Thereafter, McMahon evidently was

largely detached from the deal-makers and, during the last two weeks of December, from December 18, 1999 through January 3, 2000, McMahon was on vacation. Thus, McMahon was at his home when he was connected into the December 23, 1999 telephone conference between Fastow and Merrill Lynch's Daniel Bayly, and others. McMahon was investigated but never indicted. Both the government and Brown and his co-defendants stipulated at trial that McMahon, if called to testify at Brown's trial, would have pled Fifth Amendment immunity, rendering him unavailable to testify.[36]

Brown asserts that two letters written after Brown's trial by counsel for then former Enron Treasurer McMahon--one sent to the Department of Justice on April 25, 2005,[37] for the stated purpose to request that the government not indict McMahon on the Nigerian barge transaction, and the other sent to the SEC on July 28, 2006[38] to advance settlement negotiations--constitute newly discovered evidence that the barge transaction contained no promise or guarantee.[39] Brown also contends that the government suppressed

---

[36] Trial Tr. at 5260-61.

[37] Document No. 1168, ex. C (emphasis added) [hereinafter "McMahon DOJ Letter"].

[38] Document No. 1020, ex. A [hereinafter "McMahon SEC Letter"].

[39] To the extent Brown asserts that these post-trial letters, as opposed to any pre-trial interview notes, constitute a <u>Brady</u> violation meriting a new trial on Counts IV and V, he is incorrect. *See* 2 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 256, at 141 (4th ed. 2009) ("[E]xculpatory evidence must exist at the time of the trial to qualify as Brady material."). Brown, however,

interview notes from the Senate Permanent Subcommittee on Investigations interviews with McMahon. Each contention is addressed in turn.

a.   The McMahon Letters

In relevant part, the letters from McMahon's attorneys generally speak to three topics: (1) McMahon's understanding of the

---

points to Monroe v. Butler, 690 F. Supp. 521, 525 (E.D. La. 1988), *aff'd*, 883 F.2d 331 (5th Cir. 1988). In Monroe, a petitioner convicted of first degree murder in state court alleged a Brady violation in his habeas petition to the district court based upon the prosecution's non-disclosure of a report of another man's possible confession to the murder. 883 F.2d at 332. Because the state authorities failed to disclose potentially exculpatory evidence to the petitioner during the period allowed for post-conviction relief (i.e., a motion for new trial) under state law, the district court ordered that the petitioner be granted "whatever he was entitled to by way of post-conviction relief during the limitation period provided by Louisiana law for a request for new trial based upon the exculpatory material which the State courts did not have an opportunity to consider . . . ." Id. The state court then held an evidentiary hearing to consider the new evidence, whereupon it denied a new trial. Id. No new trial was mandated by the Brady violation; "the only constitutional problem was the failure of the state court to fully review the newly discovered matter in deciding upon post-trial relief." Id. at 333. In other words, the error in Monroe happened only after the trial; it therefore did not affect the fairness of the trial itself, and therefore did not directly mandate a new trial. It only affected the fairness of the state court's consideration of whether to grant the petitioner a new trial; therefore, a re-consideration of the motion for new trial was the only thing mandated.

Brown is already getting exactly what Monroe stands for: consideration of the McMahon letters in a motion for new trial. Monroe does not speak to the standard applied to evaluate that evidence in the motion for new trial *itself*, but because they are alleged to be post-trial newly discovered evidence, they are considered under the five-part "newly discovered evidence" test.

24

overall transaction; (2) his understanding of Fastow's representations to Merrill Lynch during the 9:30 a.m. December 23, 1999 conference call; and (3) his opinion on the veracity of Glisan's and Fastow's Enron-related testimony pertaining to himself.

In both letters, McMahon's attorneys each repeatedly point to their client's lack of involvement in the Nigerian barge transaction beyond its initiation, essentially describing McMahon's minimal involvement and understanding of the transaction in general.  For example, "Mr. McMahon did not negotiate the terms and conditions of the transaction with Merrill Lynch. . . .  After his initial telephone contact, Mr. McMahon did not have any further involvement with the transaction until December 23, 1999."[40]  The letters also emphasize his passive role in the December 23 conference call:  McMahon, on vacation at the time, "participated in the conference call from his home" and "did not speak . . . other than to acknowledge he was indeed on the conference call."[41]  Any argument that McMahon's description of the transaction should be believed over contradictory evidence would necessarily be undercut by McMahon's asserted lack of involvement.

---

[40] McMahon DOJ Letter at 6.

[41] Id. at 8.

With respect to the conference call in which McMahon listened at home without speaking (the second relevant topic of the letters), McMahon's counsel wrote to the Department of Justice:

> Any language used by Mr. Fastow in the 9:30 a.m. conference [call on December 23, 1999] with Merrill Lynch was, of course, directed to his fund's private placement agent and his investors in LJM2. None of this language, by which Mr. Fastow communicated anything with respect to Enron's position regarding the Nigerian barge equity, translated to Mr. McMahon as a commitment for *Enron or any of its affiliated entities* to repurchase Merrill Lynch's interests.
>
> . . .
>
> In sum, any language used prior to or during the conference call, directly or indirectly, was not understood by Mr. McMahon to entail a commitment by *Enron and its affiliated companies* to repurchase Merrill Lynch's interest.[42]

Similarly, the letter to the SEC states:

> [A]t no time during the call did Mr. Fastow ever suggest that *Enron* would "repurchase" the interest from Merrill Lynch or "guarantee" that Merrill Lynch would not incur risk of loss associated with the investment.[43]

Brown has failed to demonstrate that these statements would probably lead to a new result in a new trial. First, the statements do not necessarily contradict Fastow's version of the

---

[42] McMahon DOJ Letter at 9 (emphasis added).

[43] McMahon SEC Letter at 6 (emphasis added).

26

December 23 call, as discussed above with respect to the Fastow Raw
Notes, and by the Fifth Circuit in <u>Skilling</u>:

> [I]t was not Enron itself that was formally bound to buy
> the interest from Merrill Lynch; LJM would do so if
> Enron's "best efforts" did not result in another buyer.

<u>Skilling</u>, 554 F.3d at 589.   Second, to the extent that the
statements are viewed even more broadly as including LJM, McMahon's
lawyers' claims in these letters are contradictory to the testimony
of numerous government witnesses at trial, including Tina Trinkle,
Sean Long, Ben Glisan, and Michael Kopper, not to mention that LJM
did in fact take Merrill Lynch out of the barges by the June 30,
2000 deadline.  Given McMahon's obvious self-interest in disavowing
wrongdoing to avoid indictment, and the substantial evidence
presented in the five weeks-long Brown trial, Brown has shown
nothing in these lawyer-letters that would probably produce a new
result.[44]

Finally, with respect to the third topic of the letters, Brown
provides a *partial* quotation of two sentences in McMahon's lawyer's
letter to the SEC:

> Finally, Mr. McMahon has reviewed the transcript of
> Mr. Fastow and former Enron treasurer Ben Glisan's

---

[44] For the same reason, Brown has failed to show that the
government's various statements in opening and closing arguments
referencing Enron's promise to Merrill Lynch, made through either
Fastow or McMahon, constitute "egregious misconduct."  *See* Document
No. 1217, ex. A, Chart 2.

testimony in the Lay-Skilling trial, Mr. Glisan's
testimony in the trial of the Nigerian Barge case and the
FBI's Form 302 of Mr. Fastow's statements regarding the
transaction.  Based on that review and his knowledge of
what actually occurred, Mr. McMahon has concluded that
both men testified falsely.[45]

Without using any ellipses, Brown omits from the last sentence its

concluding limiting clause: the letter in fact stated that McMahon

"concluded that both men testified falsely *regarding Mr. McMahon's*

*involvement in the transaction.*"[46]   Viewed in context, this

statement lacks the requisite materiality; it states only that

Glisan misrepresented *McMahon's* role.   At most, this evidence is

"merely . . . impeaching," and there is no plausible basis to

conclude that it would probably lead to a new result.   *See* <u>Runyan</u>,

290 F.3d at 246-47.[47]   Moreover, even considering cumulatively the

content of both letters written by McMahon's lawyers to avoid his

indictment and to settle with the SEC, Brown has failed to show

that a new trial would probably lead to a new result.

---

[45] Document No. 1020 at 3 (quoting McMahon SEC Letter at 6).

[46] McMahon SEC Letter at 6 (emphasis added).

[47] The Court also finds that the assertions of McMahon's
counsel in these letters fail to demonstrate that the government
either sponsored or intended to sponsor perjured testimony, despite
Brown's suggestion.  *See* Document No. 1020 at 3 n.4.

b.  The McMahon Interview Notes

Brown also asserts a Brady violation in that the government allegedly suppressed information from the notes of the Senate Permanent Subcommittee on Investigations' interviews with McMahon.[48] The interview notes, which pre-date Brown's trial, indicate that McMahon had "[n]o recollection of a promise (to re-buy) outside best-efforts promise in the phone call."[49]  The notes also state: "Never made rep[resentation] to [Merrill Lynch] that [Enron] would buy them out [illegible] or [] @ rate of return."[50]  However, the government disclosed the following in its July 30, 2004 disclosure letter, which it provided to Brown and his co-defendants in response to this Court's order[51]:

_____

[48] Document No. 1217 at 8.

[49] Id. (citing id., ex. D at 000544).

[50] Id., ex. D at 000449.

[51] See Document No. 290 at 8-9 (Order Dated July 14, 2004). Prior to issuing the July 14, 2004 Order, the Court reviewed in camera much of the material that Brown now asserts contains Brady information.  The Court's in camera review included "the testimony and other materials that led the Government to identify to Defendants 22 persons who may have exculpatory testimony." Document No. 228 (Minute Entry for May 27, 2004 Pretrial Conference); Document No. 205, exs. 1 & 2 (listing the 22 persons, which included Jeff McMahon, Katherine Zrike, Gary Dolan, and Schuyler Tilney).

After that review, the Court ordered the government to "provide to Defendants summaries of the exculpatory information that led the Government to identify Kathy Zrike and other witnesses as having exculpatory testimony."  Document No. 290 at 9.  The Court acknowledged that "[a]lthough this may be more than is

29

> McMahon did not recall any definite push to get the
> [Nigerian Barge Deal] done by year end.  Merrill wanted
> Enron/Fastow's assurance that Enron would use best
> efforts to syndicate or find a buyer for these assets.
> It was not unusual for this type of agreement not to be
> in writing.  McMahon does not recall any guaranteed take
> out at the end of the 6 month remarketing period.[52]

As with the Fastow Raw Notes, that Brown was actually informed of

the substance of this information means it was not suppressed.  *See*

*Skilling*, 554 F.3d at 575 (evidence is not "suppressed" when a

defendant "knows or should know of the essential facts that would

enable him to take advantage of it").[53]

---

required by *Brady* at this juncture, the Court is of the opinion
that the requirement is warranted given the extensive investigation
that the Government has conducted and the large number of witnesses
it has identified who possibly have exculpatory information for
these Defendants."  *Id.*

[52] Document No. 1168, ex. O at 7 [hereinafter "July 2004
Disclosure Letter"].

[53] As observed above, moreover, the parties stipulated to the
fact that McMahon, if called to testify at Brown's trial, would
have pled the Fifth Amendment.  Trial Tr. at 5260-61.  Brown has
not shown how having access to the actual interview notes, as
opposed to a summary of their substance, would have enabled him to
take any greater material advantage of the information; for
example, he has failed to demonstrate that any of the interview
notes would have been admissible at trial, or that they would have
provided substantially different material from which to formulate
cross-examination of government witnesses.

Brown *has* argued that the non-disclosure of the McMahon
interview notes (as well as the Fastow interview notes) constitutes
a *Brady* violation because the notes contradict testimony from Ben
Glisan, the government's "star witness," and Michael Kopper, who
ran "a close second."  Document No. 1217 at 10-11.  However, as
already discussed, Brown had the substantive information from both
Fastow's and McMahon's interviews that was necessary to cross-

iii.  Katherine Zrike

Katherine Zrike, who was a principal witness for the Merrill Lynch defendants, testified for 1-1/2 days.  A New York lawyer, Zrike had joined Merrill Lynch in 1994, after having practiced for eight years at Shearman & Sterling in New York City and for about a year and a half at Warner Lambert.  At the time of the Nigerian barge transaction, Zrike was chief legal counsel for the investment banking division of Merrill Lynch, with 30-35 lawyers in her worldwide group.  She was Merrill Lynch's senior in-house lawyer who was consulted and involved in working on the Nigerian barge transaction.

Brown alleges that the government suppressed grand jury testimony of Katherine Zrike,[54] omitting "all Zrike's testimony and statements regarding the best-efforts assurances and her attempts

---

examine Glisan and Kopper.  Brown was able to use both disclosures to formulate cross examination, and has shown nothing in either the Fastow Raw Notes or the McMahon interview notes that would have given Brown additional effective ammunition to use in cross examination.

[54] Brown also, without argument, includes charts of allegedly concealed evidence from Zrike's SEC testimony and FBI 302.  *See* Document No. 1217, Charts 3 and 5.  After examination of Brown's excerpts of this material, the Court finds no suppression of substantive information.  To the extent that minor differences exist between Zrike's SEC testimony and her grand jury and trial testimony, Brown has failed to demonstrate that he by due diligence could not have uncovered the same information from this defense witness during her lengthy testimony at Brown's trial.

to document it."[55]   For example, Zrike stated in her grand jury
testimony:

> The other thing that we marked up and we wanted to add
> was a best efforts clause, what's called a best efforts
> clause[,] that they would use their best efforts to find
> a purchaser to conclude the purchase with the--another
> third-party purchaser besides ourselves and that--
> realizing that from our perspective as Merrill Lynch
> lawyers that this was not--this was still a--was not a
> guarantee, it was not an absolute, but that at least
> would give us an angle, it would give us a legal angle to
> get them to focus on that obligation if, in fact, we saw
> them not paying attention to what was the business
> deal.[56]

In her testimony at Brown's trial, Zrike stated multiple
times, in answers both to defense counsel and on cross-examination
by the government, that her understanding was that Enron made an
oral agreement to re-market the barges.[57]   For example, when Zrike
was asked about Government Exhibit 203, an internal Merrill Lynch
document, she affirmed again her understanding of Enron's re-
marketing commitment:

> Q.   Okay.  All right.  And this prior sentence before
> that, "Enron will facilitate our exit from the
> transaction with third-party investors," was that
> consistent with what you knew about the re-marketing
> agreement?

---

[55] Document No. 1217 at 6 (citing Document No. 1168, ex. F at
55, 63-64, 66-70).

[56] Document No. 1168, ex. F at 63.

[57] *See, e.g.*, Trial Tr. at 4069, 4101, 4108-09, 4122-23, 4126,
4230, 4241, 4269-4270, 4275, 4277.

A.   Yes, it was.

Q.   Okay.  And so, when you read, "Enron is confirming this commitment to guarantee the ML take-out within six months," did you also assume that that meant the re-marketing agreement?

A.   Yes.[58]

In light of Zrike's extensive testimony on what she understood was Enron's oral re-marketing agreement, as well as her testimony on many other topics and details, Brown has shown no suppression of any of Katherine Zrike's knowledge of the transaction.  Moreover, the alleged non-disclosure of Zrike's unsuccessful attempts to put in writing that Enron would use its "best efforts" to re-market the barges is no <u>Brady</u> violation.  The evidence was quite clear that Enron would not agree in writing to *any* obligation to re-market the barges--period--whether by the use of "best efforts" or not.[59]

Finally, Brown has not shown that he or his co-defendants could not have elicited the same testimony from Zrike at trial by the exercise of due diligence.  This is not a case in which the defendants had insufficient information to elicit the relevant

---

[58] Trial Tr. at 4277.

[59] Even had this additional testimony been elicited, it would amount to an immaterial difference over the substance of Zrike's testimony already of record regarding her impression of the deal as a re-marketing agreement.  Hence, Brown has failed to show materiality.

exculpatory testimony.[60]   Defendants knew that Zrike was Merrill Lynch's senior-most attorney on the barge transaction; they knew her impression of the deal; they called her and had every opportunity to ask her about her participation in drafting the deal documents.  Brown, who had consulted with Zrike in putting together the transaction, had no reason to have been oblivious to the obvious expectation that, as Merrill Lynch's lawyer, Zrike would attempt to introduce language into draft deal documents that was favorable to Merrill Lynch.  A defendant is expected to exercise at least reasonable diligence in uncovering information.   *See*

---

[60] Brown cites <u>United States v. Fisher</u> as an example of where the defense did not have sufficient information even to recognize the particular significance of a potential witness.  Document No. 1160 at 18 (citing 106 F.3d 622, 634-35 (5th Cir. 1997), *abrogated on other grounds by* <u>Ohler v. United States</u>, 120 S. Ct. 1851 (2000)).  The potential witness's accountant provided "central" testimony on the bank fraud charge on which the defendant was convicted.  106 F.3d at 634.  That accountant testified that the potential witness had been aware of a loan that the accountant took out in the potential witness's name.  <u>Id.</u>  After the accountant testified, the government on the last day of trial produced an FBI 302 report of an interview with the potential witness wherein the witness claimed to have had no knowledge of the loan in his name. <u>Id.</u>  Without this disclosure, the defense had no basis to assume that the potential witness did not know of the loan, and thus did not call the potential witness.  *See* <u>id.</u> at 634-35.  While this testimony would not have directly exculpated the defendant, "it would have severely impeached the testimony of a key government witness."  <u>Id.</u> at 635.  The late disclosure was thus a <u>Brady</u> violation.

Here, in contrast, Brown knew and had worked with Zrike, who was head of the investment banking counsel group, and he had consulted her in putting together the barge transaction.  She testified as a friendly witness, on call of the Merrill Lynch defendant Bayly.  Brown had all of the knowledge necessary and full opportunity to elicit any favorable testimony.

Skilling, 554 F.3d at 574; *see also* United States v. Sipe, 388 F.3d 471, 478 (5th Cir. 2004).   That Brown, with the benefit of hindsight, is now dissatisfied with the testimony elicited does not demonstrate a Brady violation.

     iv.  Gary Dolan

Gary Dolan in 1999 was a lawyer in Katherine Zrike's investment banking counsel group.   He worked with Zrike and Brown on the year-end Nigerian barge transaction.   Brown's co-defendant Robert Furst and the government stipulated that, although Furst subpoenaed Dolan as a defense witness, Dolan would invoke his Fifth Amendment privilege against self-incrimination and was therefore an unavailable witness.[61]

Brown complains that in government disclosures pertaining to Dolan, the government omitted the following sentence from a statement found in the FBI's 302:

> Dolan believed that such an agreement would be improper because such a transaction could be viewed as a "parking" transaction.[62]

This was the last sentence of a paragraph in the 302 that was substantially copied verbatim by the government in its pretrial disclosure to Brown on July 30, 2004:

---

[61] Trial Tr. at 4924.

[62] Document No. 1217, ex. B-2 at 5.

> As to a draft engagement letter in his files, Dolan made changes to some of the engagement letter terms related to the deal because Dolan did not believe that those were the actual terms.  Dolan stated that the original draft of the engagement letter obligated Enron to eventually take [Merrill Lynch] out of the Nigerian Barge transaction.  This was contrary to Dolan's understanding of the transaction.[63]

That Dolan, a lawyer, would recognize that a written obligation by Enron eventually to take Merrill Lynch out of the Nigerian barge transaction could be viewed as a "parking transaction" adds nothing material.  The disclosure that *was* important, which Brown received, was that Dolan--consistent with what Brown now claims is the truth--said he believed Enron was *not* agreeing eventually to take Merrill Lynch out of the barge deal.  Evidence is not "suppressed" when a defendant "knows or should know of the essential facts that would enable him to take advantage of it."  <u>Skilling</u>, 554 F.3d at 575 (quoting <u>Runyan</u>, 290 F.3d at 246).[64]

Brown also asserts that the government failed to inform him that "Dolan explained his notes which reflected his knowledge of

---

[63] July 2004 Disclosure Letter at 5; *cf.* Document No. 1217, ex. B-2 at 5.

[64] The government's disclosure that attorney Dolan made changes to the engagement letter certainly provided Brown with information sufficient to challenge through questioning any testimony or evidence to the contrary, and the government's disclosure of the fact that Dolan made changes to the engagement letter was sufficient to alert Brown as to whose handwriting was on the engagement letter.  Brown has failed to demonstrate a suppression of this complained-of evidence relating to Dolan.

the deal, the fees to [Merrill Lynch], and the gain to Enron."[65] As observed above, the government disclosed Dolan's knowledge of the deal; it separately disclosed to Brown the fees to Merrill Lynch and gain to Enron prior to trial.[66] Nonetheless, Brown asserts that Dolan's knowledge of the fees to Merrill Lynch and gain to Enron is vital to contradict the prosecution's opening statement at Brown's trial that there would be no evidence "that any lawyer was asked if it was all right for Enron to count this deal as income."[67] Brown asserts that the "prosecutors knew--but withheld--that Dolan and Zrike had told them that the lawyers were well aware that Enron was going to book a gain from this transaction."[68]

Brown and his co-defendants, however, had the knowledge necessary to put on evidence to combat this argument. Before Brown's trial Defendants were given a copy of a Merrill Lynch submission to the SEC wherein Zrike's understanding of the barge transaction was explained.[69] The SEC submission stated that Zrike[70]

---

[65] Document No. 1217 at 5.

[66] *See* Document No. 1223 at 5-6; Gov't Exhibits 203, 209, 212.

[67] Trial Tr. at 419.

[68] Document No. 1227 at 2.

[69] *See* Document No. 125, ex. 5 (Merrill SEC letter attached to Defendant Daniel Bayly's Motion to Compel).

[70] Because Brown hinges the importance of Dolan's knowledge of Enron receiving income from the transaction upon his status as an

concluded that Merrill Lynch was at risk in its ownership of the barges despite Enron's offer to facilitate finding a third-party buyer, and that Zrike and her colleagues considered Enron's re-marketing offer and all circumstances of the transaction, and concluded it did not negate true sale treatment.[71]  In other words, Brown was fully informed that Zrike and her colleagues--which included Dolan--were aware that the transaction would be considered a sale--that is, that Enron would book income on it.  Indeed, Zrike even testified at trial that, at the time of the transaction, she thought it "was [an] equity transaction" that "involved the purchase of interest in the barges in the form of equity."[72]  In fact, she also testified, in response to defense counsel questioning, that she and Dolan both met with Brown to learn more about the barge transaction.[73]

To the extent that *Dolan*'s knowledge of income booking by Enron was suppressed, such was cumulative of information disclosed to Brown and his co-defendants and immaterial in light of the testimony and evidence elicited at trial.

_____

attorney, and lumps Dolan's superior, Zrike, into the argument, Zrike's knowledge is also relevant.  Both were Merrill Lynch attorneys working on the transaction.

[71] *See* id., ex. 5 at 5-7.

[72] Trial Tr. at 4230.  *See also* id. at 4126.

[73] Id. at 4055-63.

v.   <u>Schuyler Tilney</u>

Schuyler Tilney was the head of Merrill Lynch's Houston banking group in late 1999.  He was identified as one of those on the December 23, 1999, telephone conference between Fastow and Merrill Lynch's Daniel Bayly.  Tilney was not indicted.  Tilney's lawyer advised co-Defendant Furst's counsel that if subpoenaed, Tilney would plead the Fifth Amendment,[74] and neither the government nor Brown or any of his co-defendants called Tilney to testify at trial.

Brown asserts that excerpts from the raw notes taken in interviews with Tilney demonstrate suppression.  Brown specifically complains of the following alleged omissions (quoted from Brown's Supplemental Memorandum in Support of his Motion for New Trial):

1)   [The prosecution] withheld that Tilney told the government affirmatively that Fastow *told* Merrill Lynch that Enron "will find a new home" for Merrill's equity interest.[75]

2)   Tilney said that "ML had no legal recourse to Enron" and that "ML [was willing to] place $7 million at risk to build its relationship with Enron."[76]

---

[74] Document No. 348, ex. K.

[75] Document No. 1217 at 11 (citing <u>id.</u>, ex. F at 000704) (emphasis in original).

[76] <u>Id.</u> at 11-12 (citing <u>id.</u>, ex. F at 000679).

39

3)   A "'commitment to guaranty' [reflected in the APR] conflict[ed] w[ith]/his understanding of what would take place under [the] transaction."[77]

4)   Fastow's representations *did not include a guarantee--orally or in writing.*[78]

5)   There was "no legal obligation for E[nron] to do anything."[79]

The government disclosed to Brown in its pretrial July 2004 Disclosure Letter the following:

> Tilney thought Fastow said on the call that they could not give Merrill assurances in writing because otherwise it would not have been a true sale.  Tilney indicated that he believed Merrill was at risk in the [Nigerian barge deal] at the end of 1999.  If Enron were unable to find a home for the barges, Merrill would own the barges.  Enron did not represent that if the Marubeni deal fell through and Enron was unable to secure another buyer then they would make it up to Merrill in some other way.  Merrill had been informed by Enron that Arthur Andersen had blessed the transaction and its true sale characteristic.   Tilney stated that he believed the [Nigerian barge deal] was proper.[80]

Again, Brown has failed to point to any non-disclosed interview notes that do not convey the same substantive information as found

---

[77] Id. at 12 (citing id., ex. F at 000706).

[78] Id. (citing id., ex. F at 000680) (emphasis in original).

[79] Id.  (citing id., ex. F. at 000727).  Brown also includes several other quotes from Tilney's raw notes, without further argument, in an attached chart.  *See* Document No. 1217, Chart 9. They add nothing material to the excerpts that are the subject of Brown's arguments.

[80] July 2004 Disclosure Letter at 8.

in the Court-ordered July 2004 Disclosure Letter.  Indeed, the latter disclosure identifies Tilney as holding views consistent with what Brown is now urging, namely, that there was no promise by Enron to take Merrill Lynch out of the barge transaction and that it was a true sale that put Merrill Lynch at risk.  Also, as with McMahon's interview notes, Brown has failed to show how he would have been able to use the raw notes of Tilney's statements any more effectively or differently than his use of Tilney's statements summarized in the government's disclosure.

      vi.  <u>Alan Hoffman</u>

     Alan Hoffman is a New York attorney who, in 1999, was with the law firm of Whitman, Breed, Abbott & Morgan, whose New York office merged with Winston & Strawn in 2000.[81]  According to the 302 on Hoffman's interview, Hoffman after joining the firm had worked on Merrill Lynch matters in his practice specialty, which is structured finance.  A few days before Christmas 1999, Hoffman received a call from Brown, who retained Hoffman as outside counsel in connection with the Nigerian barge transaction.[82]  Brown told Hoffman the deal had to be completed before year-end.[83]  Brown

---

    [81] *See* Trial Tr. at 4132-33.  Hoffman's 302s refer to his firm of employment only as Winston & Strawn; for simplicity's sake, the Court will do the same.

    [82] Document No. 1020, ex. G at 1.

    [83] <u>Id.</u>

instructed Hoffman to focus on three areas: the non-recourse loan, the indemnification agreement, and reviewing the deal to make sure that there were no adverse tax consequences.[84]

Notwithstanding that it was Brown himself who retained Hoffman to represent Merrill Lynch in aspects of the transaction, Brown complains that the government provided to Brown no disclosure relating to Hoffman.  In particular, Brown asserts that the 302 of Alan Hoffman's interview contained exculpatory evidence.[85]  The arguably relevant statements include: (1) Hoffman's opinion that Brown and Fuhs were very ethical; (2) that Enron had no "obligation to find a buyer of Merrill Lynch's interest," but that "there was an unwritten understanding that Enron would help ML find a purchaser for their interest in the Nigerian Barge"; and (3) that Hoffman and his colleagues at Winston & Strawn examined aspects of potential liability arising from the deal.[86]

Given Brown's history of dealings with Hoffman, Brown presumably knew better than anyone Hoffman's high opinion of his ethics.  This is not a Brady violation.  The absence of a written obligation to re-market in the transaction's closing documents and the "unwritten understanding" between Enron and Merrill Lynch, as

---

[84] Id.

[85] See Document No. 1020 at 12-13 n.11; id., ex. G at 5; see also Document No. 1201 at 5.

[86] See Document No. 1201 at 5.

42

well as the several descriptions of what that agreement was, were
fully established by numerous other disclosures as recited *ad
nauseum* above; Brown offers no reason why Hoffman's understanding,
substantially the same as that expressed by some other witnesses,
adds anything material. Thus, Brown has failed to demonstrate
materiality with respect to Hoffman's statements that Enron had no
obligation other than to help Merrill Lynch find a buyer.  Finally,
with respect to Brown's third contention as to Hoffman, Winston &
Strawn's examination of Merrill Lynch's potential liability
pertaining to tax issues, whether Merrill Lynch would be viewed as
a utility under U.S. law, and possible Nigerian legal liability, if
relevant at all, were all best known by Brown himself, who hired
Hoffman and gave him his instructions.  Brown has thus failed to
show suppression of Hoffman's examination of Merrill Lynch's
potential liability.

     vii. and viii.  <u>Kevin Cox and Paul Wood</u>

     Kevin Cox, according to Brown, was head of Merrill Lynch's
credit department and involved in the preliminary discussions
regarding the Nigerian barge transaction.  Paul Wood, according to
Brown, was a Merrill Lynch credit manager.

     Cox was a member/participant in Merrill Lynch's Debt Markets
Commitment Committee ("DMCC").  That committee considered debt
transactions that Merrill Lynch became involved in, whether as an

underwriter or as a lender.   According to Katherine Zrike's testimony at Brown's trial, Zrike decided that the barge transaction should be considered by a group other than the banking team and she turned to the DMCC.   That group met on December 22, 1999, and among those present were Zrike, Kevin Cox, and Brown. After presentation of the barge deal and discussion, Zrike testified at Brown's trial that the DMCC "decided that they did not believe that it was in their jurisdiction to approve an equity purchase and so they did not approve it or disapprove it."[87]

Kevin Cox and Paul Wood each testified to a grand jury after Brown was convicted and sentenced.   Brown claims their testimony is "newly discovered evidence" that entitles Brown to a new trial.[88] The testimony to which Brown points, however, is only cumulative of what defendants elicited through the testimony of Zrike.   Cox testified that the DMCC concluded "that the only way for this transaction to meet the client's [Enron's] needs would be if it was an actual sale or a true sale and that in order to have a true sale, Merrill Lynch would have to be at risk and that there wasn't

_____

[87] Trial Tr. 4094.

[88] Document No. 1061 at 30-31.  For the same reasons discussed with respect to the McMahon DOJ and SEC letters, the Court reviews the post-trial Cox and Wood statements under the "newly discovered evidence" standard, not as a Brady violation.  *See supra* p. 23, n. 39.

any way that the company [Enron] could do anything to make us whole--or buy it back . . . ."[89]

Paul Wood's grand jury testimony, cited by Brown, is that at Merrill Lynch he heard not that there was no written commitment from Enron, but that it was "a high level person at Enron who, while not committing Enron Corp. on any kind of oral contract, was giving his assurances that he would do what he could to influence things so that there would be, you know, a--that Merrill would be taken out."[90]

The testimony of both is cumulative but, in addition, its substance was amply disclosed to Brown and his co-defendants in the government's July 2004 Disclosure Letter. Among other things, Brown was advised with respect to Kevin Cox as follows:

> At the DMCC meeting, Cox believed the Merrill representatives asked themselves what the [Nigerian barge deal] was and concluded that it was not a loan. There were assurances that Enron would use its best efforts to complete the original sale. Enron did not promise to do anything.[91]

Likewise, the government's disclosure regarding Paul Wood included, among other things, the following:

---

[89] Document No. 1061 at 30-31 (citing Document No. 1020, ex. H at 30).

[90] Id. at 31 (citing Document No. 1020, ex. F at 73).

[91] July 2004 Disclosure Letter at 3.

> During the DMCC meeting, someone on the deal team said
> that, although Enron could not guarantee that it would
> take the deal off Merrill's hands, the Merrill team had
> assurances that Enron would take the deal off of
> Merrill's hands.  This was what Wood meant when he wrote
> "handshake deal" in a document.  The DMCC did not discuss
> obtaining a guarantee from Enron and turning the deal
> into a loan.[92]

Brown has not carried his burden to show that his failure to
present this evidence was due to anything other than his own lack
of effort, one of the five requisite showings for a new trial based
on newly discovered evidence.  *See* United States v. Runyan, 290
F.3d 223, 246 (5th Cir. 2002).  As observed above, the government
disclosed to all defendants, pre-trial, the substance of Cox's and
Wood's impressions of the deal.

In his Motion to Dismiss for Egregious Prosecutorial
Misconduct (Document No. 1168), Brown also points to Wood's grand
jury testimony that Wood believed Zrike was on a telephone
conference call among Merrill Lynch employees discussing the barge
transaction (the "Trinkle call"), although Zrike did not say
anything.[93]  Wood was on vacation at the time and he was connected
to the call from his home.  Trinkle testified at Brown's trial that
no lawyer was on that call and, moreover, that until the government
prosecutor asked her about Zrike, Trinkle "never heard of her," and

---

[92] Id. at 8.

[93] Document No. 1168, ex. R at 75.  This call, often referred
to as the "Trinkle call," is summarized in Brown I.  459 F.3d 509,
515 (5th Cir. 2006).

had "no idea" if Zrike worked on the Nigerian barge transaction.[94]
Zrike herself--a defense witness--testified that she was never on
a conference call with Tina Trinkle, and specifically did not
participate in a December 1999 "phone call in which the [Merrill
Lynch] bankers from Texas were explaining what was going on in the
barge deal to Mr. Bayly, with people from the credit division on
the phone[.]"[95]   Given the significant direct evidence adduced at
trial that Zrike was not on this call, Wood's contrary
belief--based on his having written her name on a note he made of
the call--and his recollection that Zrike said nothing on the call,
is not newly discovered evidence that would probably lead to a
different result at a new trial.

3.   Cumulative Materiality

Amidst the huge volume of materials and briefing that Brown
has unloaded on the Court, and after examining Brown's complaints
in context with all of the disclosures actually made to Brown
before trial, only a scant few possibilities of "suppressed
evidence" can arguably be found.   These largely boil down to the
Fastow Raw Notes corroboration of multiple iterations of drafts
of the deal documents; the Fastow Raw Notes statement that Fastow
told "Enron people there was a guarantee so to light a fire under"

---

[94] Trial Tr. at 1076, 1077.

[95] Trial Tr. at 4256-57.

them; the McMahon interview notes statements that McMahon does not recall Enron making a guarantee; that Zrike unsuccessfully tried to add "best efforts" language in the deal documents[96]; that Dolan specifically knew that Enron would treat the transaction as a sale and book income; and Hoffman's 302 regarding Hoffman's understanding of the deal.

As has been seen, none of these non-disclosures, or any other actually suppressed item of evidence, rises to a level of materiality, that is, none--had the items of evidence been disclosed--in reasonable probability would have led to a different result.  Viewing all of these items in the aggregate, and taking into account their cumulative effect in the light of other evidence, the same result is reached.  Quite to the contrary of Brown's argument, the additional fragments of evidence cumulatively relied on by Brown do not render "literally true" Brown's grand jury testimony, but would largely be cumulative, or mere nuances, of other evidence that Brown and his co-defendants presented and argued at trial.  The government's substantial documentary evidence and witness testimony at trial that supported the jury's findings about the barge transaction and the Enron/Merrill Lynch agreement, which underlie its verdict on Brown's perjury and obstruction

---

[96] The Court reiterates its conclusion that Brown failed to show due diligence with respect to Zrike's efforts to include the "best efforts" language, but nonetheless includes this in its materiality analysis for the sake of completeness.

convictions, are not a subject of elaboration in this analysis but, as the presiding judge at the Brown trial, this Court considers all of that as well in assessing materiality.  The Fifth Circuit in Brown I, 459 F.3d at 528, 529, ably summarized evidence supporting the jury's verdict, including an email that Brown authored the year *after* the barge transaction when he was working on another deal. Recalling the barge transaction as having been successful, Brown wrote that Merrill Lynch "had Fastow get on the phone with Bayly and lawyers and promise to pay us back no matter what.  Deal was approved and all went well."[97]

    In short, there is no reasonable probability that the outcome of Brown's trial would have been different if the government had disclosed to Brown before his trial the several additional items that he claims were wrongfully suppressed.  Given the mass of material developed in the government's investigations and the magnitude of the disclosures made, and taking into account the evidence at trial, the cumulative effect of what was not disclosed does not at all undermine confidence in the outcome of the trial. The same conclusion applies to those few items of alleged newly discovered evidence that did not exist at the time of Brown's trial.  Brown is not entitled to a new trial.

---

[97] Gov't Exhibit 240.

### III.  Motion to Dismiss

Brown also seeks dismissal of Counts I through III of the
Indictment for egregious prosecutorial misconduct.[98]  Brown's many
arguments for dismissal may be grouped in two categories:
(1) alleged Brady violations[99] and (2) allegations that the
government unconstitutionally interfered with Brown's access to
exculpatory witnesses.[100]

The important distinction between Brown's arguments regarding
Counts I through III and his arguments for a new trial on Counts IV
and V is that Brown has *already* been awarded a new trial on Counts
I through III because of the flawed honest services theory of wire
fraud.  *See* Brown I, 459 F.3d 509, 523 (5th Cir. 2006).  *Dismissal*
of these counts, as opposed to a new trial thereon, requires a
showing of conduct "'so outrageous' that it violates the principle
of 'fundamental fairness' under the due process clause of the Fifth
Amendment."  United States v. Mauskar, 557 F.3d 219, 231-32 (5th
Cir. 2009) (quoting United States v. Johnson, 68 F.3d 899, 902 (5th
Cir. 1995)); *see also* United States v. Hammond, 598 F.2d 1008,
1014-15 & n.6 (5th Cir. 1979) (granting new trial, although

---

[98] *See* Defendant James A. Brown's Motion to Dismiss Indictment
for Egregious Prosecutorial Misconduct, Brady Violations and Double
Jeopardy (Document No. 1168).

[99] Document No. 1168 at 13-54.

[100] Id. at 54-71.

defendant sought dismissal, because defendant had "not proved that the government's involvement in these offenses was so outrageous"). "The standard for proving outrageous governmental conduct is extremely demanding," United States v. Sandlin, 589 F.3d 749, 758 (5th Cir. 2009), and "[s]uch a violation will only be found in the 'rarest' of circumstances." Mauskar, 557 F.3d at 232 (quoting Johnson, 68 F.3d at 902). The Fifth Circuit has "declined to find outrageous conduct where the Government failed to disclose that the defendant's signature on a particular document was forged . . . engaged in entrapment . . . or abducted the defendant from his home country to circumvent extradition proceedings." Sandlin, 589 F.3d at 759 (citing Mauskar, 557 F.3d at 232-38; Stokes v. Gann, 498 F.3d 483, 485 (5th Cir. 2007); United States v. Chapa-Garza, 62 F.3d 118, 121 (5th Cir. 1995)). Brown has cited no case ever decided by the Fifth Circuit Court of Appeals in which an indictment was dismissed for outrageous government conduct.[101]

## A.    *Brady* Violations

Brown relies upon much of the same alleged Brady violations in support of his Motion to Dismiss as relied upon in his various

---

[101] United States v. Henderson, which Brown does cite, affirmed dismissal of an indictment without prejudice as a sanction for the government's continued failure to comply with a court order to pay for a state trial transcript found to be necessary to the preparation of an indigent defendant's case, which failure was found to prejudice the defendant. 525 F.2d 247, 249-51 (5th Cir. 1975).

51

motions for new trial.  He argues that the government suppressed evidence proving: (1) that "neither McMahon nor Fastow ever made a buy-back guarantee"; (2) that "counsel for both Enron and Merrill were fully informed" and made critical decisions, which "deprived Brown of the good faith and reliance on counsel defenses"; (3) that Merrill Lynch counsel "knew there was an oral understanding to re-market the barges and tried to formalize this agreement"; (4) that "a lawful best efforts assurance was the only agreement ever reached"; and (5) that the buyback language from the engagement letter was deleted by Merrill Lynch's counsel Dolan.[102] He again relies primarily on: the Fastow Raw Notes, Fastow's subsequent Newby deposition, and his Skilling testimony[103]; the McMahon DOJ and SEC letters[104]; the grand jury testimony of Kevin Cox and Paul Wood[105]; Katherine Zrike's grand jury and SEC testimony[106]; the FBI 302 of Gary Dolan[107]; and the FBI 302 of Alan Hoffman.[108]  As detailed above, these allegations fail to establish Brady violations warranting a new trial; they likewise fail to

---

[102] Document No. 1168 at 11-12.

[103] Id. at 13-28, 44 & n.53, 46-47.

[104] Id. at 28-34.

[105] Id. at 34-36.

[106] Id. at 36-43, 46-47, 49-54.

[107] Document No. 1204 at 14-17.

[108] Document No. 1168 at 17-19.

carry the more onerous burden to establish outrageous government conduct meriting dismissal of Counts I through III.

B.    Interference with Witnesses

Brown also alleges that the government intentionally interfered with his ability to call exculpatory witnesses.[109]  He points to: (1) the non-prosecution agreement between the government and Merrill Lynch[110]; (2) the effect of the government's ongoing investigation, which included indications of "unindicted co-conspirators,"[111]; and (3) the effect of the government's request that an Enron Task Force representative be present for any defense counsel interview of Merrill Lynch employees,[112] and its alleged requirement of the presence of a representative in any interview of Andrew Fastow.[113]

---

[109] Brown does not, and indeed may not, seek a new trial as to Counts IV and V based on his claims of witness interference. Because these are not newly discovered evidence claims, Brown was required to seek a new trial based on them within seven days after the Fifth Circuit's October 2006 mandate affirming his convictions. *See* Fed. R. Crim. P. 33(b)(2) (2006).  Even were Court to apply the 2009 amendment to Rule 33, extending 33(b)(2)'s time limit to 14 days, Brown's request for a new trial on these grounds would still be barred.

[110] Document No. 1168 at 57-65.

[111] Id. at 66-68.

[112] Id. at 65-66.

[113] Id. at 69-70.

1.   <u>Legal Standard</u>

"The Sixth Amendment guarantees a criminal defendant the right to present witnesses to establish his defense without fear of retaliation against the witness by the government." <u>United States v. Skilling</u>, 554 F.3d 529, 567 (5th Cir. 2009), *vacated in part on other grounds*, 130 S. Ct. 2896 (2010) (quoting <u>United States Bieganowski</u>, 313 F.3d 264, 291 (5th Cir. 2002)).  Similarly, the "Fifth Amendment protects the defendant from improper governmental interference with his defense." <u>Id.</u> (quoting <u>Bieganowski</u>, 313 F.3d at 291).  Both the government and defense "have an equal right, and should have an equal opportunity, to interview [witnesses]." <u>United States v. Soape</u>, 169 F.3d 257, 270 (5th Cir. 1999) (quoting <u>Gregory v. United States</u>, 369 F.2d 185, 188 (D.C. Cir. 1966)).  A defendant's rights are not violated, however, "when a potential witness freely chooses not to talk [to defense counsel]." <u>Skilling</u>, 554 F.3d at 567 (quoting <u>In re United States</u>, 878 F.2d 153, 157 (5th Cir. 1989)).   "[T]o demonstrate governmental infringement on these Sixth Amendment rights, 'the defendant must show that the government's conduct interfered substantially with a witness's free and unhampered choice to testify.'"  <u>Id.</u> (quoting <u>United States v. Thompson</u>, 130 F.3d 676, 686 (5th Cir. 1997)).

54

2.  Discussion

A review of Brown's arguments demonstrates that he has failed to carry the "extremely demanding" burden to show conduct so "outrageous" as to characterize these as the "rarest circumstances" meriting dismissal of the Indictment.  *See* Mauskar, 557 F.3d at 231-32; Sandlin, 589 F.3d at 758.

The non-prosecution agreement between the United States and Merrill Lynch stated that Merrill Lynch may not:

> [T]hrough its attorneys, board of directors, agents, officers or employees make any public statement, in litigation or otherwise, contradicting Merrill Lynch's acceptance of responsibility set forth above.[114]

Merrill Lynch acknowledged the following "responsibility" in the agreement:

> Merrill Lynch acknowledges that the Department has developed evidence during its investigation that one or more Merrill Lynch employees may have violated federal criminal law.  Merrill Lynch accepts responsibility for the conduct of its employees giving rise to any violation in connection with the Year-End 1999 Transactions.[115]

Brown characterizes this as a bar against any Merrill Lynch employee "disputing (legitimately or not) the government's theory

---

[114] Document No. 1168, ex. H at 3.

[115] Id., ex. H at 2.

of the case."[116]   The terms Merrill Lynch agreed to, however, did not foreclose Merrill Lynch's employees, individually, from disputing the government's theory of the case.   First, the agreement spoke only to Merrill Lynch's ability to make statements *through* its employees, not its employees' abilities to make statements on their own behalf.   Second, Merrill Lynch's promise not to disavow responsibility for its employees' actions has no bearing on the antecedent issue of whether those actions were criminal or not.   Merrill Lynch in the agreement accepted responsibility for *actions* "giving rise to any violation," and acknowledged that some of its employees "*may* have violated federal criminal law"; it did not declare that a "violation" necessarily had occurred.

Indeed, Katherine Zrike, still a Merrill Lynch employee at the time of Brown's trial,[117] testified for the defense that her understanding of the transaction was one containing a re-marketing agreement, as discussed above.   Moreover, Merrill Lynch provided to Zrike a "waiver of attorney-client privilege for [her] to provide testimony through the course of this investigation . . . ."[118]

Though Brown quotes extensively from United States v. Stein ("Stein I"), 435 F. Supp. 2d 330 (S.D.N.Y. 2006) and United States

---

[116] Document No. 1168 at 59.

[117] *See* Trial Tr. at 4048.

[118] Id. at 4043.

v. Stein ("Stein II"), 495 F. Supp. 2d 390 (S.D.N.Y. 2007), the
case leading to those two decisions is factually inapposite.
There, the district court found that the government interfered with
the Sixth Amendment rights of several accounting firm employees by
pressuring the accounting firm--which was subject to a deferred
prosecution agreement--into believing that the government would
"hold against it" the payment of the employees' defense costs.
Stein II, 495 F. Supp. 2d at 394-95; Stein I, 435 F. Supp. 2d
at 365-68.  The court made several findings that the government
impermissibly coerced the accounting firm into believing that any
payment of its indicted employees' defense costs would "be held
against the firm": it first made the threat in a memorandum;
government attorneys then "reinforced the threat" by "placing the
issue of payment of legal fees high on its agenda for its first
meeting" with the firm's counsel; government attorneys further
implied "that anything more than compliance with demonstrable legal
obligations [regarding attorneys' fees] could be held against the
firm,"; and the attorneys made a "colorful warning that the [United
States Attorneys' Office] would look at any discretionary payment
of fees by [the firm] 'under a microscope,'" which "drove the point
home." Stein II, 495 F. Supp. at 394-95.  Thus, the court found
that the firm's "decision to cut off all payments of legal fees and
expenses to anyone who was indicted" and to condition payment of
any fees "upon cooperation with the government was the direct

consequence of the pressure applied" by the government.  Id. at
395.

Here, in direct contrast to Stein, when Brown was tried it was
well known among counsel and the Court that he and his Merrill
Lynch co-defendants' attorneys' fees were being paid by Merrill
Lynch; in fact, this was remarked as cause for mild envy by counsel
representing Brown's Enron co-defendants who had to fund their
defenses from their own limited personal resources.  Apart from
that, however, Brown has made no showing of any "colorful
warnings," intentional threats, or similar strong-arm tactics
brought to bear upon Merrill Lynch in connection with its non-
prosecution agreement that would lead the Court to conclude that
Merrill Lynch was pressured to prevent defense access to witnesses.
Instead, Brown merely alleges that the government threatened
Merrill Lynch and its employees with indictment if they
contradicted the government's theory of the case,[119] a conclusion
apparently derived from nothing more than reading the government's
list of persons who were named as investigative targets or
unindicted co-conspirators.[120]

---

[119] Document No. 1168 at 57.

[120] Id. at 60-63.  Brown and his co-defendants repeatedly *asked*
for the government to identify the known co-conspirators, which led
to the government providing their names in advance of trial. *See*
Document No. 1160, ex. T (Government's April 22, 2004 letter
listing unindicted co-conspirators); Document No. 177 (Order Dated
April 21, 2004) ("The Government has agreed to furnish to
Defendants the names of known unindicted co-conspirators forty-five

Brown's allegations of threats to indict Merrill Lynch employees tie into his second contention about what he describes as the "chilling effects" of the government's ongoing investigation. However, the government's ongoing investigation does not support a finding of impermissible government interference.  As the Fifth Circuit held in <u>Skilling</u> when ruling on a similar argument about the investigative actions of the Enron Task Force, "the government is always entitled to investigate and punish criminal conduct." 554 F.3d at 571.  As in <u>Skilling</u>, Brown has offered no direct evidence, and none appears of record, that the government conducted its investigation of the Nigerian barge transaction for the purpose of intimidating witnesses into silence as distinguished from conducting a large-scale investigation and identifying others where probable cause may be found to prosecute, independent of their willingness to testify on behalf of Brown or any other defendant. *See* <u>id.</u>; *cf.* <u>Hammond</u>, 598 F.2d at 1012-13 (substantial interference found where, during recess after direct and cross examination, defense witness was threatened with prosecution in a separate matter if he "continued on"; the witness and another, who had not yet testified, were subpoenaed before the grand jury the next day).

---

(45) days in advance of trial.  With this understood, the motions for bills of particulars are otherwise DENIED."); Document No. 126 at 1 (Bayly's request); Document No. 141 at 4 (Boyle's request); Document No. 135 at 3 (Brown's request); Document No. 117 at 37 (Furst's request); Document No. 109 at 1 (Kahanek's request).

Indeed, Katherine Zrike, who testified at length for Defendants, was never indicted.

Brown's third claim of interference is that the government at one point *requested* that Merrill Lynch's counsel permit a government attorney also to be present if a defense counsel interviewed a Merrill Lynch employee. This provoked a dispute that led Bayly to file a motion to dismiss the indictment. In response, the government clarified:

> [T]hat this was a request only and that the decision whether to permit Merrill employees to be interviewed by the defense and whether to permit the government's attendance was a decision that resided in the sole discretion of Merrill Lynch and, ultimately, the employee herself.[121]

This is not the kind of conduct such as in <u>Gregory</u>, where the prosecutor instructed the witness to talk to no one unless the prosecutor were present. <u>Gregory</u>, 369 F.2d at 188. It certainly does not rise to a level of outrageous conduct requiring dismissal of the Indictment. Instead, this is more closely akin to <u>United States v. Nardi</u>, where the First Circuit held that the government's informal grant of immunity, which left it free to prosecute the witness if he failed to cooperate, was not substantial interference with defense counsel's right to interview that witness absent a

---

[121] Document No. 191 at 2 (citing <u>id.</u> at 10-11 (Affidavit of David Hennessy, Assistant U.S. Attorney)).

showing of coercion, even though the witness apparently refused the interview.  *See* 633 F.2d 972, 977 (1st Cir. 1980).

Regardless, the dispute motivated Merrill Lynch--rather than to be stuck in the middle of such requests for interviews by defendants and like requests from the government--to adopt a policy of hiring an independent counsel for any employee with whom any defendant wished to speak.[122]  The decision on whether to grant such an interview and on what terms was left entirely to the employee, who had the benefit of advice from his or her own personal counsel.[123]  Merrill Lynch's provision of independent counsel to employees undermines any implication that the government's request unduly influenced those employees by reason of the government's non-prosecution agreement with Merrill Lynch.

Brown also presents the February 25, 2008 affidavit of co-defendant Robert Furst's trial attorney:

> In an attempt to gain access to Fastow before the first Barge trial, I contacted the Enron Task Force and requested that I and other Defense counsel be allowed to interview Fastow.  The Task Force informed me and other Defense counsel that I was free to contact Fastow's counsel to request an interview, but that I and other Defense counsel would not be able to interview Fastow unless a Task Force attorney was also present at the interview.[124]

---

[122] *See* Document No. 191 at 11.

[123] Id. at 4-5.

[124] Document No. 1168, ex. V at 1-2.

Furst's attorney's affidavit does not state *when* this exchange took place, or with whom.  In response, the government points to its letter to defense counsel dated April 5, 2004, more than five months before trial, which contains no such condition:

> Some of you have expressed an interest in interviewing Andrew Fastow.  If you wish to interview Mr. Fastow, or any other witness for that matter,  you should contact that witness's lawyer.  Mr. Fastow is represented by David Gerger.[125]

The Court recalls no pretrial dispute between the government and Brown or his co-defendants about any conditions the government imposed on defendants' interviews with Fastow.  Moreover, as discussed with respect to Brown's request for a new trial, even if Fastow through his own counsel declined interviews, Brown and his co-defendants received in the government's June 2004 Disclosure Letter the essential substance needed, combined with their own knowledge of the deal, to evaluate whether to call Fastow as a witness.

In sum, the government is not shown to have engaged in "outrageous conduct" such as would justify dismissal of the Indictment on Counts I, II, and III.

---

[125] Document No. 1185, ex. 13.

IV.   Order

Accordingly, Defendant James A. Brown's Motion for New Trial (Document No. 1004), Defendant James A. Brown's Supplemental Memorandum in Support of Motion for New Trial (Document No. 1020), Defendant James A. Brown's Supplemental Brief in Support of Motion for New Trial on Counts IV and V (Document No. 1160), Defendant James A. Brown's Supplemental Memorandum in Support of His Motion for New Trial (Document No. 1217), and Defendant James A. Brown's Motion to Dismiss Indictment for Egregious Prosecutorial Misconduct, Brady Violations, and Double Jeopardy (Document No. 1168) are all DENIED.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED at Houston, Texas, on this 23rd day of August, 2010.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

63